IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ARTHUR J. GALLAGHER & CO., | ) | |
| | ) | |
| Plaintiff, | ) | Civ. A. No. 07-271 |
| | ) | |
| v. | ) | Chief Judge Donetta W. Ambrose |
| | ) | Magistrate Judge Lisa Pupo Lenihan |
| PATRICK REISINGER, | ) | |
| | ) | Doc. No. 5 |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

### I.  RECOMMENDATION

It is respectfully recommended that Plaintiff's Motion for Preliminary Injunction (Doc. 5) be denied.  It is further recommended that a ruling on Plaintiff's Motion for Permanent Injunction be postponed until the underlying merits of Plaintiff's claims have been determined either on summary judgment motion or upon verdict after a jury trial.

### II.  REPORT

In this case, Plaintiff, Arthur J. Gallagher & Company ("Gallagher"), seeks to enforce two restrictive covenants–a non-compete clause and non-disclosure clause–contained in an Executive Agreement that it entered into with its former employee, Defendant, Patrick Reisinger ("Reisinger"). Gallagher has filed a motion for preliminary and/or permanent injunction, seeking to enjoin Reisinger from providing insurance/employee benefits consulting services to its former customer, Allegheny League of Municipalities ("ALOM"), among other things.  An evidentiary hearing was held on March 21 and 22, 2007, at which the following individuals testified: Daniel Bernstein; Richard Dunlap; and Defendant Reisinger.  In addition, each party submitted an affidavit from an

unavailable witness: Affidavit of Christine D. Greb, submitted on behalf of Plaintiff; and Affidavit

of David Hinderstein, submitted on behalf of Defendant.  After thoroughly reviewing the evidence

presented and the relevant law, the Court makes the following findings of fact and conclusions of

law.

        A.      **Findings of Fact**

1.     Patrick Reisinger worked for Gallagher  as a benefits consultant from December 9,

1996 through January 10, 2007.  (Tr. I at 11, 136; Pl.'s Ex. 13.)[1]

2.     Mr. Reisinger is currently affiliated with National Retirement Partners and Oberlin

Financial as an independent broker-dealer.  (Tr. I at 155.)

3.     The Court finds that Mr. Reisinger was a credible witness.

4     Mr. Reisinger approached Gallagher for a job when he learned from a friend that the

position was open.  (Tr. I at 127-28.)

5.     Mr. Reisinger testified that he first met with David Hinderstein on October 14, 1996,

at a diner in the Poconos to interview for a benefits consultant position with Gallagher.  (Tr. I at

129.) At that meeting, Hinderstein discussed with Mr. Reisinger the description and responsibilities

of the position that Mr. Reisinger was interviewing for, but never discussed with Mr. Reisinger that

a restrictive covenant would be included in the terms of employment. (*Id.*)

6.     Mr. Reisinger testified that in November of 1996, he met for a second interview with

David Hinderstein, Tom Welling and other representatives of Gallagher in Yonkers, New York.  Mr.

Reisinger was not informed of any restrictive covenant during this second interview by Hinderstein,

---

[1]All references to the hearing transcript are designated as "Tr."  Testimony recorded on
March 21, 2007 designated as "Tr. I" and testimony recorded on March 22, 2007 is designated as
"Tr. II."  All references to exhibits refer to the exhibits admitted into evidence at the hearing.

Welling, or any other representatives of Gallagher in November of 2006.  (Tr. I at 131-32.)

7.      Gallagher subsequently offered Mr. Reisinger the benefits consultant position, with a starting salary of $38,000 and additional bonus structure, by sending him an offer letter dated November 14, 1996.  (Tr. I at 133; Tr.  II at  23-24;  Pl.'s Ex. 2.)

8.      Mr. Reisinger admits receiving Gallagher's offer letter, but he did not recall signing the second page of the offer letter and returning it to Gallagher, and he could only locate the first page of the letter in his files.  (Tr. I at 133-34.)

9.      The offer letter confirms a base salary and bonus formula.  (Pl.'s Ex. 2.)

10.     The offer letter provides information regarding Mr. Reisinger's eligibility to participate in the company's employee benefit programs.  (*Id.*)

11.     The offer letter informs Mr. Reisinger that he is being hired as an employee at will and is subject to the company's personnel policies.  (*Id.*)

12.     The offer letter identifies the signing of an Executive Agreement to be a part of the company's personnel policies, but did not attach the Executive Agreement or restate any portion thereof. (*Id.*)

13.     The offer letter stated that a condition of Mr. Reisinger's offer of employment  was his signing an Executive Agreement, but it did not refer to, or advise, Mr. Reisinger that restrictive covenants were part of the terms of the offer.  (*Id.*)

14.     Mr. Reisinger testified he accepted the offer and agreed to start work at Arthur J. Gallagher & Company as a benefits consultant for Gallagher Benefits Services.  (Tr. I at 135.)

15.     Gallagher's written offer is set forth in a letter dated November 14, 1996 on the letterhead of Gallagher Benefits Services of New York, a subsidiary of Gallagher.  (Tr. I at 13; Pl.'s

Ex. 2.)

16.     Mr. Reisinger promptly signed the employment application form dated November 24, 1996, which reflects an employment date of December 9, 1996.  (Pl.'s Ex. 6.)

17.     The application form contains language which informs Mr. Reisinger that the first 90 days of his employment are to be considered  introductory and subject to the company performing a number of additional processing tasks such as an investigation into his employment background, criminal record, credit history, education, satisfactory references and driving record.  (Pl.'s Ex. 6.)

18.     Mr. Reisinger began working for Gallagher on December 9, 1996, in Yonkers, New York. (Tr. I at 136-37.)  Mr. Reisinger had already been made aware of what his salary and benefits would be at Gallagher before starting his job on this date, and he had completed and signed his enrollment forms relating to his benefits plans sent by Gallagher prior to starting work on December 9, 1996.  (Tr. I at 137; Tr. II at 26-28; Pl.'s Ex. 7, 8-1 to 8-3.)

19.     Mr. Reisinger testified that he met with Doris DiRoma, Gallagher's executive secretary, on December 9, 1996, to go over various employee paperwork that had previously been sent to him relating to employee benefits, income taxes and his employment application.  However, Mr. Reisinger testified that an Executive Agreement was not included in the paperwork that Mr. Reisinger reviewed on this date, and Ms. DiRoma never informed Mr. Reisinger that he would have to sign an Executive Agreement.  (Tr. II at 27-30.)

20.     Mr. Reisinger first learned that a restrictive covenant was connected with his employment at Gallagher when he received a copy of the Executive Agreement, which was sent to his current office in Pittsburgh, Pennsylvania, on or about January 17, 1997, via Federal Express, from the Gallagher offices in Yonkers, New York.  (Tr. I at 138-39; Tr. II at 26.)

21.     Mr. Reisinger also received a telephone call from his supervisor, David Hinderstein, on January 17, 1997, the same day he received the Executive Agreement via Federal Express. Hinderstein, in a vocal manner, asked Mr. Reisinger if he had received the Executive Agreement and then threatened Mr. Reisinger that if he did not sign the Executive Agreement, he would be fired. (Tr. I at 138.)  Hinderstein, however, never informed Mr. Reisinger during this telephone call that the Executive Agreement contained a restrictive covenant. (Tr. I at 139.)

22.     Mr. Hinderstein states in his sworn affidavit that "[i]n mid-January, at the direction of GBS management, I informed Mr. Reisinger that he would receive an Executive Agreement and that he must sign it and return it to the office." (Def.'s  Ex. B, ¶ 5.)

23.     Mr. Reisinger acknowledged receiving a fully executed copy of the Executive Agreement on January 19, 1997.  (Tr. I at 140.)

24.     Mr. Reisinger testified when he received the Executive Agreement on January 17, 1997, it was the first time he had ever seen the document. (*Id.*)

25.     Although Christine D. Greb, Assistant Corporate Secretary for Gallagher, states in her sworn affidavit that it was the policy and practice for all Benefits Consultants hired by Gallagher in 1996 and presently to sign Executive Agreements as a condition of their employment, Ms. Greb had no independent recollection or knowledge regarding when Mr. Reisinger was presented with his Executive Agreement or when Mr. Reisinger's Executive Agreement was executed.  Ms. Greb's knowledge consists of Gallagher's general procedure and practice for the preparation, execution and retention of Executive Agreements.  (Pl.'s Ex. 18, ¶¶ 4, 17.)

26.     The Executive Agreement contains provisions which restrict an employee for a period of two years following the date of termination from doing work for a company account for

which the employee did work in the two years before the termination.  (Pl.'s Ex. 9, ¶ 14A.)

27.     The Executive Agreement contains a recognition by the employee that by virtue of his employment, he will be granted otherwise prohibited access to confidential and proprietary data of the company,  not known either to  competitors or within the insurance agency and brokerage business generally.  (Pl.'s Ex. 9, ¶ 13.)

28.     Daniel Bernstein testified that he was currently the Area Vice President of Gallagher and, as such, supervised benefits consultants and the work the performed in managing the relationships with institutional clients and retirement plan clients.  (Tr. I at 6.)

29.     Mr. Bernstein supervised Reisinger from October 2006  until Reisinger's departure from Gallagher in January 2007.  (Tr. I at 58.)

30.     While Mr. Bernstein may have been credible, he had no knowledge of the hiring practices in effect at the time Mr. Reisinger was hired aside from his experience with his own hiring. In addition, he did not participate in the hiring of Mr. Reisinger nor did he have any discussions with him about his executive agreement and the existence of any restrictive covenants.  (Tr. I at 29, 56, 60.)

31.     Mr. Bernstein never spoke with Mr. Reisinger about compensation, benefits or the Executive Agreement before Mr. Reisinger was hired by Gallagher.  Furthermore, Mr. Bernstein had no knowledge of whether Tom Welling, David Hinderstein or any other Gallagher representative ever discussed the Executive Agreement with Mr. Reisinger before Mr. Reisinger was hired.  (Tr. I at 60-61.)

32.     Mr. Bernstein had no knowledge as to whether Mr. Reisinger received the entire offer letter or just the first page, and testified that to the best of his recollection, there was not a signed

copy of the letter in Mr. Reisinger's personnel file.  (Tr. I at 62.)

33.     Mr. Bernstein had no knowledge regarding the execution of Mr. Reisinger's Executive Agreement.  Mr. Bernstein is not the individual who sent the Executive Agreement to Mr. Reisinger and was not involved in the execution of Mr. Reisinger's Executive Agreement in any way.  Furthermore, Mr. Bernstein never saw anyone execute Mr. Reisinger's Executive Agreement. Mr. Bernstein had no knowledge as to when Mr. Reisinger and the Gallagher representatives executed the Executive Agreement, and he did not know who received and executed the Executive Agreement first.  (Tr. I at 65.)

34.  Mr. Bernstein testified that generally, the type of confidential information to which a benefits consultant would have access, as an employee of Gallagher, included such information as the design of a retirement plan, investments offered under that retirement plan, compensation paid to Gallagher Benefit Services of New York to service a particular retirement plan, the formula for determining compensation, participant accounts, and the balances in those accounts and in people's individual investment allocations.  (Tr. I at 28-29.)

35.  Mr. Bernstein had no knowledge of what specific confidential information Mr. Reisinger was given access to during his employment with Gallagher.  (*Id.*)

36.  The Executive Agreement signed by Mr. Reisinger prohibits an employee from divulging the company's confidential information or making use of it for his own purpose for a period of two years following the termination of his employment.  (Pl.'s Ex. 9, ¶ 13.)

37.  While employed as a benefits consultant for Gallagher and its subsidiaries, for over ten years, Mr. Reisinger was primarily responsible for servicing the ALOM account.  (Tr. I at 132, 146.)

7

38.     ALOM is an association of municipalities in Allegheny County, whose members include the County, the City of Pittsburgh, and hundreds of other smaller municipalities and authorities.  (Tr. I at 88.)

39.     As a service to its members, ALOM offers a deferred compensation plan to government employees.  (Tr. I at 88-89.)

40.     ALOM was an account of Gallagher and its subsidiaries before Mr. Reisinger began working for the company.  (Tr. I at 17-18.)

41.     In the year 2006, ALOM accounted for $153,287 in fee compensation for Gallagher, which, according to Mr. Bernstein, represented a significant amount of business to Gallagher.  (Tr. I at 51-52; Pl.'s Ex. 16.)

42.     When Mr. Reisinger signed the Executive Agreement on January 17, 1997, he was already performing services for the ALOM, including working with Paula Gerstenberger to learn how to service the account and making contacts at the different municipalities.  (Tr. I at 141-42.)

43.     Mr. Reisinger testified that during his ten (10) years of employment with Gallagher Benefit Services, his work consisted of servicing the defined contribution retirement plan for the ALOM.  Mr. Reisinger never provided any placement or replacement of insurance service for ALOM, and never handled any insurance claims or insurance administrative functions for the ALOM.  (Tr. I at 142.)

44.     While employed by Gallagher, Mr. Reisinger's responsibilities with respect to the ALOM account included: performing orientations for municipal groups, running investment meetings, signing up individual participants, performing annual investment reviews, marketing, answering inquiries by telephone from both participants and municipal employers, and the

performance of investment reviews and vendor counseling.  (Tr. I at 143-45.)

45.     Mr. Reisinger did not attempt to solicit ALOM as a client during his employment with Gallagher.  (Tr. 1 at 95, 99, 106-07, 159, 175-77.)

46.     There is no evidence that Mr. Reisinger attempted to solicit any employees of Gallagher.

47.     From the time of his hiring through the date his employment ceased, Mr. Reisinger was a paid employee in the exclusive employ of Gallagher and received no compensation from any outside sources for his services as a benefits consultant.  (Tr. I at 33, 111-12.)

48.     Richard Dunlap has been the executive director of ALOM since September 1, 2003. (Tr. I at 87.)

49.     The court finds that Mr. Dunlap was a credible witness.

50.     Dunlap, an attorney, was very familiar with employment law and the types of restrictions employees commonly face, having practiced for a while in the non-compete area.  (Tr. I at 87, 99-100.)

51.     During the time period that Mr. Reisinger worked for Gallagher while Richard Dunlap served as executive director to the ALOM, no other representative of Gallagher serviced the retirement plan for ALOM or interacted with the ALOM in any capacity.  (Tr. I at 146-47.)

52.     Mr. Reisinger and Mr. Dunlap both testified that during the fall of 2006, Mr. Reisinger initially informed Mr. Dunlap of changes occurring at Gallagher. Mr. Reisinger shared his concerns with Mr. Dunlap as to the direction Gallagher possibly was taking with regard to retirement benefit services.  (Tr. I at 94, 157.) According to Mr. Reisinger and Mr. Dunlap, Mr. Reisinger never attempted to solicit the ALOM account during this time period.  (Tr. I at 94-95, 99, 106-07, 159,

175-77.)

53.     Dunlap observed no decline in service to his plan at the ALOM and received no complaints from the plan's participants.  (Tr. I at 113-14.)

54.     Throughout the fall of 2006, Reisinger gave Dunlap the impression that his level of concern with Gallagher was growing and that he was seriously thinking about changing jobs.  (Tr. I at 114-16.)

55.     Both Mr. Reisinger and Dunlap testified that on Friday, December 22, 2006, Mr. Reisinger visited Dunlap's office and informed Dunlap that he intended to resign from Gallagher, although Reisinger had not yet advised Gallagher of his intention to leave.  (Tr. I at 97, 115.)  Mr. Reisinger informed Dunlap of his pending departure from Gallagher so that Dunlap would be aware that Mr. Reisinger would be unable to speak with participants because he would not be licensed to do so, and advised Dunlap to forward all telephone calls from participants of the retirement plan to Prudential for assistance.  (Tr. I at 98, 159-60.)  Both Dunlap and Mr. Reisinger testified that Mr. Reisinger never asked or solicited Dunlap to keep the ALOM account at any time during this meeting.  (Tr. I at 99, 159-60.)

56.     On December 26, 2006, Reisinger sent a resignation letter to Daniel Bernstein, his then supervisor at Gallagher, indicating he was terminating his employment with Gallagher effective immediately.  (Pl.'s Ex. 11.)

57.     Reisinger's resignation letter invites Bernstein to contact Reisinger's lawyer if he has any questions.  (*Id.*)

58.     Mr. Reisinger testified that he instructed his attorney to advise Gallagher that he would continue working for Gallagher for an additional fourteen (14) days to assist in the transition

period if they requested him to do so, however he did not expect Gallagher to make such a request based on their prior history of immediately terminating employees after giving notice of their intentions to resign. (Tr. II at 56-58; Pl.'s Ex. 11.)  Furthermore, Mr. Reisinger also did not expect Gallagher to request him to continue with the company for an additional period because he was about to go on a previously scheduled ten (10) day vacation starting December 26, 2006, and he did not believe Gallagher would want to continue paying him while on vacation.  (Tr. II at 57-58.)

59.     In a letter from Reisinger's counsel to Jerome S. Hanner, Assistant General Counsel for Gallagher, Mr. Farrell advised that Reisinger agreed to abide by the applicable post- termination provisions, including the return of all equipment and information to Gallagher, and setting a new departure date of January 10, 2007.  (Pl.'s Ex. 13.)

60.     Mr. Reisinger returned all Gallagher property, including files, contact lists, and computer,  to Gallagher before he left its employment on January 10, 2007.  Mr. Reisinger did not retain any confidential or proprietary Gallagher materials or information.  (Tr. I at 40, 169-71; Tr. II at 48.)

61.     Mr. Reisinger did have a copy of his computer hard drive made at the request and advice of counsel, however, he has never accessed the hard drive since leaving Gallagher, and the hard drive remains in the possession of his attorneys.  Mr. Reisinger testified that he would return the copied hard drive to Gallagher if the company requested him to do so.  (Tr. I at 170; Tr. II at 63-65.)

62.     Additionally, Mr. Reisinger discontinued using his Gallagher telephone number prior to leaving the company and arranged for all telephone calls related to this number to be forwarded to Prudential for further assistance.  (Tr. I at 171-72.)

11

63.     Mr. Bernstein had no knowledge that Mr. Reisinger failed to return to Gallagher any files or other property that belonged to Gallagher.  (Tr. I at 77.)

64.     Mr. McMasters and Mr. Casella, senior benefits consultants for Gallagher, contacted Dunlap and requested a meeting to discuss the possibility of Gallagher retaining the ALOM account.  Dunlap met with Casella and McMasters on January 5, 2007, at his office in Pittsburgh.  They informed Dunlap of  Reisinger's  departure, told him that Gallagher intended to replace Reisinger, and expressed Gallagher's desire to retain the ALOM account.  Although Dunlap had not informed Mr. Reisinger that he wanted to have Mr. Reisinger continue to service the ALOM account, Dunlap did advise Casella and McMasters at this meeting that Mr. Reisinger was his first choice and he wanted Mr. Reisinger to continue working with the ALOM account.  Dunlap recommended to Casella and McMasters that Gallagher should not hire a new person for the purposes of filling Mr. Reisinger's position because Mr. Dunlap was leaning towards giving Mr. Reisinger the ALOM account.  The meeting on January 5, 2007 was the only time Dunlap ever met any representative from Gallagher other than Patrick Reisinger.  (Tr. I at 101-05.)

65.     Sometime prior to his meeting with Dunlap on January 11, 2007, and while  still employed by Gallagher, Reisinger met with representatives of his new employer, NPR and Oberlin Financial, with whom he negotiated the terms for his new employment, and verbally committed to accepting a position with them.  (Tr. II at 68-69.)

66.     According to both Mr. Reisinger and Mr. Dunlap, Mr. Dunlap met with Mr. Reisinger in Dunlap's office on January 11, 2007.  Mr. Reisinger advised Dunlap that his was licensed and currently working with a new company.  Dunlap asked Mr. Reisinger if he was able to continue working with the ALOM account, and Mr. Reisinger informed Dunlap that based on advice

of counsel, he was able to continue servicing the ALOM account. Dunlap then offered to retain Mr. Reisinger as the benefits consultant for ALOM, and Mr. Reisinger accepted. (Tr. I at 105-06, 174, 179-80.)

67.     After accepting the offer, Mr. Reisinger and Dunlap testified that Mr. Reisinger presented Dunlap with a draft broker of record authorization which authorized Prudential to provide Mr. Reisinger with all information regarding ALOM's retirement benefit plans. A letter was created on ALOM's letterhead using the draft provided by Mr. Reisinger and was signed by Dunlap on January 11, 2007. (Tr. I at 107; Pl.'s Ex. 15.)  Mr. Reisinger testified that he obtained a draft of the authorization by printing a copy of a boilerplate authorization from the NRP database. (Tr. II at 69.)

68.     Richard Dunlap signed and sent the change of broker of record designation letter to Prudential, thereby removing all the ALOM's business form Gallagher and giving it to Reisinger and his new employer, Oberlin Financial, effective January 11, 2007.  (Pl.'s Ex. 15.)

69.     Mr. Reisinger also testified that in January 2007, after he had resigned from Gallagher, he was contacted by Mike Pierce, Vice President of Human Resources for Evangelical Community Hospital.  Evangelical Community Hospital was one of the entities Mr. Reisinger serviced as a benefits consultant for Gallagher.  Mr. Reisinger testified the Mr. Pierce contacted him and complained that nobody from Gallagher had come to see him regarding their account.  Mr. Reisinger, in an attempt to assist Gallagher with the transition of its business with Evangelical, contacted Gary Chalachan of Gallagher and notified him of Mr. Pierce's complaint. (Tr. I at 80-81.)

70.     Mr. Bernstein testified that the financial loss sustained by Gallagher from the loss of the ALOM account was between $ 135,000 (budgeted revenue in 2007) and $ 153,287 (actual

13

revenue in 2006).  (Tr. I at 51-52; Pl.'s Ex. 16.)

71.   In addition to the financial loss, Mr. Bernstein testified that some of the information that ALOM requested in the January 11, 2007 broker of record letter included information that Gallagher used to service its accounts, such as information about the compensation Gallagher received, the formula for determining that compensation, and the concentration of assets in various investments, which would be potentially accessible by a competitor.  (Tr. I at 53.)

### B.   Legal Standard - Preliminary Injunction[2]

Federal Rule of Civil Procedure 65(a) authorizes district courts to order injunctive relief upon an appropriate showing.   To obtain a preliminary injunction, the moving party must show: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief."  *Kos Pharm., Inc. v. Andrx Corp.,* 369 F.3d 700, 708 (3d Cir. 2004) (citing *Allegheny Energy, Inc. v. DQE, Inc.,* 171 F.3d 153, 158 (3d Cir. 1999)); *ACLU of New Jersey v. Black Horse Pike Reg. Bd. of Educ.*, 84 F.3d 1471, 1477 (3d Cir. 1996).  "Preliminary injunctive relief is 'an extraordinary remedy' and 'should be granted only in limited circumstances.'"  *Kos Pharm.,* 369 F.3d at 708 (quoting *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1427 (3d Cir. 1994)).

### C.   Discussion

Preliminarily, the Court finds that Pennsylvania law governs the interpretation and

---

[2]Although Gallagher's request for injunctive relief is predicated upon state common law claims, federal law applies to determining whether injunctive relief is appropriate.  *Viad Corp. v. Cordial,* 299 F.Supp. 2d 466, 475 (W.D.Pa. 2003) (citing *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 799 (3d Cir. 1989)) (other citation omitted).

14

enforcement of the Executive Agreement, as well as Gallagher's state common law claims.  With regard to contract disputes, a federal court exercising diversity jurisdiction is required to apply the choice of law rules of the forum state.  *Echols v. Pellulo,* 377 F.3d 272, 275 (3d Cir. 2004) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 497 (1941)).  Therefore, the Court must apply Pennsylvania choice of law rules to the contract dispute.  Generally, Pennsylvania courts honor the parties' choice of law provisions in contract disputes, *id.* (citation omitted); *Nationwide Mut. Ins. Co. v. West,* 807 A.2d 916, 920 (Pa. Super. 2002) (citation omitted), so long as the state whose laws are selected enjoys a substantial relationship to the parties or the transaction, and the application of the chosen state's law is not contrary to the public policy of another state with stronger ties.  *Verizon Commc'n Inc. v. Pizzirani,* 462 F.Supp. 2d 648, 655 (E.D.Pa. 2006) (citing *Kruzits v. Okuma Mach. Tool, Inc.,* 40 F.3d 52, 55 (3d Cir. 1994)) (footnote omitted).

In the instant matter, the Executive Agreement contains a choice of law provision which states that  the law of the executive's state of residence, as of the date of the Executive Agreement,[3] shall govern the enforcement of the Agreement.  (Ex. 9, ¶ 18.)  It is clear from the documentary evidence here that Reisinger's state of residence at the relevant time was Pennsylvania.  Moreover, Pennsylvania enjoys a substantial connection to the parties as Reisinger was a resident of Pennsylvania and conducted business on behalf of Gallagher in Pennsylvania by servicing customers located in Pennsylvania, and neither party has argued that application of Pennsylvania law would be

---

[3]Although arguably the "date of this Agreement" referenced in the choice of law provision could refer to either the date indicated on the first page of the Executive Agreement, *i.e.,* December 9, 1996, or the date when Reisinger actually signed the Agreement, *i.e.,* January 19, 1997, it is of no moment because Gallagher's personnel records clearly indicate that as of either date, Reisinger's state of residence was Pennsylvania. *See* Pl.'s Hearing Exhs. 5, 6, 7, 8-1, 8-2, & 8-3.

contrary to the public policy of another state with stronger ties.  Accordingly, the Court finds Pennsylvania law applies to its interpretation of the Executive Agreement and its enforcability under the facts of this case.

With regard to the remaining state common law claims in this diversity action, this Court is required to apply the substantive law of the forum state, in determining whether Gallagher has shown that it is likely to succeed on the merits of these claims.  *Covington v. Continental Tire, Inc.,* 381 F.3d 216, 218 (3d Cir. 2004); *Highlands Ins. Co. v. Hobbs Group, LLC,* 373 F.3d 347, 351 (3d Cir. 2004) (citing *Erie R.R. v. Tompkins,* 304 U.S. 64, 78 (1938)).

### 1.    Likelihood of Success on the Merits

Gallagher has included five counts in its Complaint, including: (1) breach of contract; (2) misappropriation of trade secrets; (3) conversion; (4) tortious interference with contractual relations; and (5) breach of fiduciary duty of loyalty.  Gallagher's likelihood of success as to the merits of each of these claims will be addressed in turn.

### a.    *Breach of Contract*

In order to determine whether Gallagher is likely to succeed on the merits of its breach of contract claim, the Court must ascertain whether the Executive Agreement is enforceable.  Under Pennsylvania law, restrictive covenants are disfavored and will only be enforced if the employer shows that the covenants are (1) ancillary to an employment relationship between the parties; (2) supported by adequate consideration; (3) reasonably necessary for the protection of the employer; and (4) reasonably limited in duration and geographic extent.  *Hess v. Gebhard & Co., Inc.,* 808 A.2d 912, 917 (Pa. 2002) (citations omitted); *George W. Kistler, Inc. v. O'Brien,* 347 A.2d 311, 314 (Pa. 1975) (citations omitted).  Reisinger, as the party challenging the validity of the Executive

16

Agreement, bears the burden of proving that the terms of the non-compete clause and other restrictions are not supported by consideration and/or are unreasonable. *Fisher Bioservices, Inc. v. Bilcare, Inc.,* Civ. A. 06-567, 2006 WL 1517382, *10 (E.D.Pa. May 31, 2006) (citing *John G. Bryant Co. v. Sling Testing & Repair, Inc.,* 369 A.2d 1164, 1169-70 (Pa. 1977)).

Where a restrictive covenant is not included in the initial contract of employment, a restrictive covenant subsequently agreed to must be supported by new consideration in order to be valid. *Kistler,* 347 A.2d at 316 (citing *Maintenance Specialties Inc. v. Gottus,* 314 A.2d 279, 281 (Pa. 1974); *Jacobson & Co. v. Int'l Env't Corp.,* 235 A.2d 612 (Pa. 1967)). In reaching this conclusion, the Pennsylvania Supreme Court acknowledged the following holding of the North Carolina Supreme Court in *James C. Greene v. Kelley Co.,* 134 S.E.2d 166, 167 (N.C. 1964): "'[W]hen the relationship of employer and employee is already established without a restrictive covenant, any agreement thereafter not to compete must be in the nature of a new contract based upon a new consideration.'" *Kistler,* 347 A.2d at 316. Moreover, the mere continuation of the employment relationship at the time the agreement containing the restrictive covenants is executed does not constitute sufficient consideration for the covenants, even though the employment relationship is terminable at the will of either party. *Id.* (citing *Maintenance Specialties, supra*) (footnote omitted). In *Maintenance Specialties,* the Pennsylvania Supreme Court opined:

> Where a covenant not to compete is executed subsequent to the initial employment, however, its performance will not be enforced unless the employee who restricts himself receives a corresponding benefit or change in status. Without such a change of status, the new contract will not qualify as a 'taking of employment' nor will there be adequate consideration to support the additional covenant of the employee.

314 A.2d at 282.

17

In the case at bar, Gallagher argues that the restrictive covenants contained in the Executive Agreement are supported by adequate consideration in the form of monetary compensation (wages and/or salary and benefits) or, in other words, Reisinger's employment was consideration for the restrictive covenants.  (Pl.'s Br. in Supp. of Mot. for Prelim. and/or Permanent Inj. ("Pl.'s Br.") at 8.)  Gallagher further contends that the November 14, 1996 letter from David Hinderstein confirming the terms of its offer of employment to Reisinger clearly indicates that his employment will be at will and that the offer is contingent upon the signing of an Executive Agreement.  (Pl.'s Br. at 9; Pl.'s Hearing Ex. 2.)  Thus, Gallagher submits that Reisinger took the job knowing that his employment was specifically made subject to the covenant, and therefore, the restrictive covenants were ancillary to the employment relationship and supported by adequate consideration.[4]

In response, Reisinger argues that the restrictive covenants in the Executive Agreement are not enforceable because the Executive Agreement is not supported by adequate consideration. Specifically, Reisinger submits that although the November 14, 1996 letter mentioned the signing of an Executive Agreement, that Agreement was never discussed, nor was he presented with a copy of the Agreement, at any of the  pre-hiring meetings with Hinderstein.  Reisinger testified that he was never informed that the Executive Agreement contained restrictive covenants. Reisinger's employment with Gallagher began on December 9, 1996, but he did not receive, nor  was he asked to sign, the Executive Agreement until  January 17, 1997.  Between December 9, 1996 and January 17, 1997, nothing changed with regard to Reisinger's employment status, compensation or benefits.

---

[4]Gallagher also submits that the restrictive covenants are reasonably necessary for its protection because they are designed to protect its legitimate business interest, *i.e.,* retaining its customers and the goodwill accompanying such customers, and that the covenants are reasonably limited in time and geographic scope.  (Pl.'s Br. at 9.)  Reisinger does not appear to be challenging these elements.

18

Consequently, Reisinger argues, there was no new consideration for agreeing to the restrictive covenants, and therefore, they are not enforceable.

After considering all of the evidence, the Court concludes that Reisinger has met his burden of showing the restrictive covenants in the Executive Agreement are not supported by adequate consideration, and therefore, are not enforceable.  The Court finds that this case is analogous to *Kistler*.  In that case, the employer never mentioned any restrictive covenants in its discussions of employment with the defendant employee.  The Pennsylvania Supreme Court found that an oral contract of employment existed two weeks prior to the execution of the written contract, based on the mutual assent of the parties to the wages, duties and benefits and the employee's agreement to quit his previous job.  347 A.2d at 315.  When the written contract, which contained the restrictive covenants, was executed two weeks later, there was no new consideration given for the restrictive covenant.  The Pennsylvania Supreme Court concluded that continuation of the employment relationship at the time the written contract was signed was insufficient consideration for the covenant, notwithstanding the fact that the employment relationship was terminable at will by either party.  *Id.* at 316 (citing *Maint. Specialties,* 314 A.2d at 281); *see also Gagliardo Bros., Inc. v. Caputo,* 538 F.Supp. 525, (E.D.Pa. 1982) (covenant not to compete held not enforceable for lack of consideration under similar facts).

Like the employee in *Kistler,* Reisinger appears to have entered an employment contract with Gallagher as of November 24, 1996 at the time he accepted the offer of employment.  Also similar to the employee in *Kistler,* Reisinger testified that he had no knowledge of the restrictive covenants at any time prior to receipt of the Executive Agreement on January 17, 1997.  Moreover, Gallagher failed to present any evidence that either Hinderstein or any other employee communicated to

Reisinger that the Executive Agreement contained restrictive covenants, or that a copy of the Executive Agreement was presented to Reisinger prior to January 17, 1997.  Nor is there any evidence that additional or new consideration was provided in exchange for agreeing to the restrictive covenants in the Executive Agreement.  Therefore, the Court concludes that Reisinger has met his burden of showing his agreement to the restrictive covenants was not supported by adequate consideration, and therefore, the covenants are not enforceable.  Consequently, Gallagher cannot show that it has a likelihood of succeeding on the merits of its breach of contract claim.  Accordingly, the Court finds that Gallagher is not entitled to injunctive relief on its breach of contract claim.

> **b.    *Misappropriation and Conversion of Confidential & Proprietary Customer Information***

In the absence of an enforceable restrictive covenant governing non-disclosure, a former employee may still be held liable for disclosure of confidential and proprietary information if the employer can establish a claim for misappropriation of trade secrets.  *Spring Steels, Inc. v. Molloy,* 162 A.2d 370, 372 (Pa. 1960) (quoting *Morgan's Home Equip. Corp. v. Martucci,* 136 A.2d 838, 842 (Pa. 1957) (holding that an employer may seek protection of its trade secret under agency principles or the law of unfair trade practices, independent of a non-disclosure agreement)).  Thus, Gallagher may still be entitled to injunctive relief if it establishes a likelihood of success on the merits of its claim that Reisinger misappropriated its confidential and proprietary customer information.

Pennsylvania courts have enunciated the following test for misappropriation of trade secrets in the context of an employer/employee relationship: "'(1) that there was a trade secret; (2) that it

was of value to [the] employer and important in the conduct of his business; (3) that by reason of

discovery of ownership the employer had the right to the use and enjoyment of the secret; and (4)

that the secret was communicated to the employee while he was in a position of trust and confidence

under such circumstances as to make it inequitable and unjust for him to disclose it to others, or to

make use of it himself, to the prejudice of his employer." *Iron Age Corp. v . Dvorak,* 880 A.2d 657,

662-63 (Pa. Super. 2005) (citing *O.D. Anderson, Inc. v. Cricks*, 815 A.2d 1063, 1072

(Pa.Super.2003)). In determining whether the allegedly misappropriated information constitutes a

trade secret, the Pennsylvania courts have considered the following factors:

> (1)    the extent to which the information is known outside the
> owner's business;
> (2)    the extent to which it is known by employees and others
> involved in the owner's business;
> (3)    the extent of measures taken by the owner to guard the
> secrecy of the information;
> (4)    the value of the information to the owner and to his
> competitors;
> (5)    the amount of effort or money expended by the owner in
> developing the information; and
> (6)    the ease or difficulty with which the information could be
> properly acquired or duplicated by others.

*Id.* at 663 (quoting *Christopher M's Hand Poured Fudge, Inc. v. Hennon,* 699 A.2d 1272, 1275 (Pa.

Super. 1997)).  To constitute a trade secret, the information must be an actual secret of the employer

and not just comprise its "general trade practices." *Id.* at 664 (citing *Felmlee v. Lockett,* 351 A.2d

273 (Pa. 1976) (citation omitted)).  In this regard, the "information must be of peculiar importance

to the employer's business" in order to be protected as a trade secret.  *Id.*  The term "trade secret"

does not, however, encompass an employee's aptitude, skill, dexterity, or his or her manual and

mental ability.  *Id.* at 663 (citing *Christopher M's,* 699 A.2d at 1275).  Likewise, "'such other

21

subjective knowledge'" that is acquired during the term of employment does not rise to the level of a protectable trade secret. *Id.* (quoting *Christopher M's, supra*).

The Pennsylvania courts further instruct that when analyzing a claim for misappropriation of trade secrets, "such analysis must balance the right of a business person to be protected against 'unfair competition stemming from the usurpation of his or her trade secrets' against the right of an individual to 'the unhampered pursuit of the occupations and livelihoods for which he or she is best suited.'" *Id.* (quoting *Renee Beauty Salons, Inc. v. Blose-Venable,* 652 A .2d 1345, 1347 (Pa. Super. 1995)). Moreover, "'the crucial indicia for determining whether certain information constitutes a trade secret are substantial secrecy and competitive value to the owner.'" *Id.* (quoting *O.D. Anderson,* 815 A.2d at 1070).

In the case at bar, Gallagher does not identify the precise trade secrets that Reisinger allegedly misappropriated, other than to state that its trades secrets are comprised of confidential and proprietary information pertaining to its customers (Compl. ¶¶ 27, 40, 47-49, 53), which includes customer lists, client files, and records containing critical customer information (Pl.'s Br. at 11). Moreover, although Mr. Bernstein testified generally as to the types of confidential information to which benefits consultants would have access,[5] he had no knowledge of the specific confidential information to which Reisinger was given access during his employment with Gallagher.

Nonetheless, Gallagher argues in its brief that is has expended substantial time and money to establish and develop customer relationships and to compile and keep information on  those

---

[5]Mr. Bernstein testified that generally benefits consultants have access to the design of retirement plans, investments offered, compensation paid for servicing plans, formula for determining compensation, participants' accounts and balances in those accounts, and individual participants' investment allocations. *See* Finding of Fact ¶ 34, *supra*.

customers.  However, Gallagher fails to explain how this information is of peculiar importance to

its business.  In addition, some of this "so-called" confidential customer information does not appear

to be exclusively within the possession of Gallagher.  For example, certain customer information

such as retirement plan documents and summary plan descriptions, individual participants' accounts,

balances in the accounts, and investment allocations, are normally given to customers and the

individual participants.  In this case, it would appear that Prudential also would have access to this

information.  Thus, the crucial indicia of a trade secret, *i.e.,* substantial secrecy and competitive value

to Gallagher, appear to be lacking with regard to this customer information.  Thus, the record

evidence does not establish this "customer information" constitutes a trade secret under prevailing

Pennsylvania law.

Nor has Gallagher made the requisite showing to prove that its customer lists constitute trade

secrets.  In *Pestco, Inc. v. Associated Products, Inc.,* the Pennsylvania Superior Court noted that

while customer lists are generally considered trade secrets,[6]  merely delineating the information

_____

[6]Under certain circumstances, the Pennsylvania Supreme Court has held that customer lists and customer data may be entitled to protection as trade secrets.  *Morgan's Home Equip. Corp. v. Martucci,* 136 A.2d 838, 842 (Pa. 1957); *see also Alexander & Alexander, Inc. v. Drayton,* 378 F.Supp. 824, 833 (E.D.Pa.), *aff'd without op.,* 505 F.2d 729 (3d Cir. 1974) (holding that customer information of insurance agencies and brokerages, consisting of customers' names, the expiration dates of their insurance contracts, and the amount of income generated by their accounts, constituted trade secrets).  In *Morgan's Home Equip. Corp.*, the Pennsylvania Supreme Court explained:

> [I]n many businesses, permanent and exclusive relationships are established between customers and salesmen.  The customer lists and customer information which have been compiled by such firms represent a material investment of employers' time and money.  This information is highly confidential and constitutes a valuable asset.  Such data has been held to be property in the nature of a "trade secret" for which an employer is entitled to protection, independent of a non-disclosure contract, either under the law of agency of under the law of unfair trade practices.

sought to be protected as "customer lists" does not automatically afford trade secret status to that information.  *Pestco, Inc. v. Associated Products, Inc.,* 880 A.2d 700, 706-07 (Pa. Super. 2005) (citations omitted).  As the Superior Court opined in *Pestco*:

> It is well-settled that '[e]quity will not protect mere names and addresses easily ascertainable by observation or reference to directories.'  *Renee Beauty Salons, Inc. v. Blose-Venable,* 438 Pa.Super. 601, 652 A.2d 1345, 1349 (1995) (citations omitted).  '[F]or customer information to be protectible it must be *a particular secret* of the business. . .'  *Van Products Co. v. Gen. Welding & Fabricating Co.,* 419 Pa. 248, 263, 213 A.2d 769, 777 (1965) (emphasis added).  While not binding upon this Court, we find the conclusions of the Eastern District Court helpful:

>> Customer lists and confidential business information, however, cannot be trade secrets if they are easily or readily obtained, without great difficulty through some independent source other than the trade secret holder and thus courts have denied protection to customer lists which are easily generated from trade journals, ordinary telephone listings, or an employee's general knowledge of who, in an established industry, is a potential customer for a given product.

> *Prudential Ins. Co.* [*of Am. v. Stella,*] 994 F.Supp. [318,] 323 n.2 [(E.D.Pa. 1998).]

889 A.2d at 707.

Gallagher has not demonstrated that it has a protectable interest in its customer lists.  While no evidence was presented by Gallagher regarding its customer lists, it appears that the names and addresses that would typically be found on such lists are of the type that can be generated from public sources such as trade journals, phone directories or the internet, and from a benefits consultant's general knowledge, based on over ten years of experience, of who in the retirement plan

---

136 A.2d at 842.

industry is a potential customer.  Here, Reisinger did not retain any physical property belonging to Gallagher.  Although there is no evidence in this case that Reisinger compiled a new customer list utilizing Gallagher's customer information, "[p]ieces of information concerning customers which an employee may recall from years of dealing with and helping to compile the same, or comparable data which he is able to compile on his own based on the experience and knowledge acquired through years of working in the business, are not protected as confidential trade secrets." *Mettler-Toledo, Inc.,* 908 F.Supp. 240, 248 (M.D.Pa. 1995).  Reisinger is entitled to use all the skills, knowledge and business acumen he acquired during the course of his employment with Gallagher. *Id.*; *Iron Age Corp.,* 880 A.2d at 663.  So long as Reisinger does not utilize any trade secrets or confidential information of Gallagher, he is free to compete aggressively against it. *Mettler-Toledo,* 908 F.Supp. At 248.  As stated earlier, there is no evidence here suggesting that Reisinger utilized Gallagher's confidential information.

Moreover, the only information which could possibly constitute trade secrets are Gallagher's design for retirement plans, compensation received, formulas for determining compensation, and the concentration of assets in various investments.[7]  However, Reisinger testified that he returned all of the Gallagher physical property he had in his possession, including files, customer accounts, and his computer, to Gallagher prior to his last day of employment, which Gallagher concedes.

Accordingly, Gallagher presented no evidence regarding the specific  information it is

---

[7]Gallagher did present some, albeit minimal, evidence at the hearing as to the proprietary and confidential nature of this information through the testimony of Mr. Bernstein.  (Tr. I at 53-54.)  Bernstein testified that some of this information included information about how Prudential and Gallagher generated their revenues from the investments in the plans and allowed Prudential to compensate Gallagher.  (*Id.*)  Information of this type is normally considered proprietary and confidential by businesses.

claiming as trade secrets, how that information was crucial to its business, and that it was an actual secret specific to its business and not otherwise available or accessible.  Because Gallagher has the burden of proving that the confidential and proprietary information constitutes a trade secret and it has failed to meet that burden, the Court finds that Gallagher has not shown a likelihood of success on its misappropriation of trade secrets claim.

In addition, there is simply no evidence to show that Reisinger retained any of Gallagher's client information after his departure from Gallagher, let alone used it to the prejudice of Gallagher. The copy of his computer hard drive was made upon request of his attorney and remains in the attorney's possession, as a legal strategy, not for misappropriation of Gallagher's claimed confidential and proprietary information.  Certainly, it can be inferred from ALOM's letter to Prudential on January 11, 2007 authorizing Prudential to release to Reisinger all information regarding ALOM's retirement plans "necessary to become completely aware of all plan features and statistics" that Reisinger did not possess this customer information.  (Pl.'s Ex. 15.)[8]  Consequently, the Court further finds that Gallagher has not shown a likelihood of success on its conversion claim, which, under Pennsylvania law, is the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification.  *McKeeman v. Corestates Bank, N.A.,* 751 A.2d 655, 659 n.3 (Pa.Super. 2000) (quoting *Stevenson v. Economy*

---

[8]It appears that some of the information pertaining to the retirement plans includes personal information regarding and investment allocations of the individual participants,  which would not be in the exclusive possession of Gallagher; indeed, both Prudential and the individual participants possess this information.   Thus, considering that ALOM authorized Prudential to release customer account information pertaining to the retirement plans to Reisinger, there can be no expectation of secrecy with regard to customer information that is not exclusive to Gallagher.

*Bank of Ambridge,* 197 A.2d 721, 726 (Pa. 1964)) (other citation omitted).[9]

Accordingly, having found that Gallagher has not shown a likelihood of success on either its misappropriation of trade secrets claim or its claim of conversion, the Court concludes that Gallagher is not entitled to injunctive relief on those claims.

> **c.      *Tortious   Interference   with   Contractual Relations***

In further support of its motion for preliminary and/or permanent injunction, Gallagher maintains that it is likely to succeed on the merits of its claim for tortious interference with contractual relations. The Pennsylvania Supreme Court has explicitly adopted Section 766 of the Restatement (Second) of Torts with regard to claims of tortious interference with existing contracts. *Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 659 (3d Cir.1993) (citing *Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 393 A.2d 1175, 1183 (Pa.1978)).[10] Section 766 of the Restatement defines this claim as follows:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third

---

[9]Although the exercise of control over the property must be intentional, one does not have to prove specific intent to commit a wrong in order to recover for conversion. *McKeeman,* 751 A.2d 655, 659 n.3 (citing *Norriton East Realty Corp. v. Central-Penn Nat'l Bank,* 254 A.2d 637 (Pa. 1969)). As to the type of property that may be the subject of conversion, it is clear in Pennsylvania that a cause of action for conversion may be maintained for almost all kinds of personal property, including money, notes, bonds, certificates of stock, title deeds. *Mackay v. Benjamin Franklin Realty & Holding Co.,* 135 A. 613, 614 (Pa.1927).

[10]As noted by the Third Circuit in *Windsor Sec.,* the Pennsylvania Supreme Court in *Adler, Barish* relied on the language used in the Restatement (Second) of Torts § 766 (Tent. Draft No. 23, 1977), however, the language in the final version of the second restatement is the same in substance as the tentative draft. 986 F.2d at 659 n. 6 (citations omitted).

person to perform the contract.

Restatement (Second) of Torts § 766 (1979).  In other words, to state a viable claim for tortious interference with a contract under Pennsylvania law, the following four elements must be demonstrated:

> (1)    the existence of a contractual, or prospective contractual relation between the complainant and a third party;
> (2)    purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;
> (3)    the absence of privilege or justification on the part of the defendant; and
> (4)    the occasioning of actual legal damage as a result of the defendant's conduct.

*Remick v. Manfredy,* 238 F.3d 248, 263 (3d Cir. 2001) (citing *Pelagatti v. Cohen,* 536 A.2d 1337, 1343 (Pa. Super. 1987)); *see also Alder, Barish,* 393 A.2d at 1182 (citing *Birl v. Philadelphia Elec. Co.,* 167 A.2d 472, 474 (Pa. 1961)).

In the case at bar, Gallagher appears to focus its attention on the second element, arguing that Reisinger has threatened to induce its customers to terminate their accounts and replace them with polices and products from its competitors.  (Pl.'s Br. at 14.)  In further support of its argument, Gallagher alleges that the evidence shows that Reisinger, in using its trade secret confidential customer information, has already caused at least one customer to replace its Gallagher products with competing products, and that Reisinger intends to send letters to other Gallagher customers soliciting their business for his new employer.  (*Id.* at 14-15.)  Gallagher's argument is flawed in several respects.

First, this Court has found that Reisinger did not solicit ALOM as a client during his employment with Gallagher.  *See* Finding of Fact ¶ 45.  A review of the record shows that Gallagher

28

failed to present any evidence at the hearing to support its allegation that Reisinger threatened to induce Gallagher's customers to terminate their accounts and replace them with policies and products from its competitors. Indeed, the record evidence shows that Mr. Dunlap at ALOM pursued Mr. Reisinger, not the other way around. Second, the record does not contain any evidence to support Gallagher's contention that Reisinger intends to send letters to other Gallagher customers soliciting their business. This is pure speculation on Gallagher's part. Rather, the evidence shows that after he resigned from Gallagher, Reisinger attempted to assist Gallagher with the transition of its business with one of its customers, Evangelical Community Hospital, after he had received a complaint from Evangelical that no one from Gallagher had contacted them regarding their account. *See* Finding of Fact ¶ 69. Finally, this Court earlier concluded that Gallagher failed to establish that the information allegedly used by Reisinger to solicit its customers constitutes a trade secret, or even if it does constitute a trade secret, was not used by Reisinger. Thus, Gallagher's argument that Reisinger used its trade secrets to solicit its customers is simply unfounded.

For these reasons, the Court concludes Gallagher has failed to establish the second element of its claim for tortious interference with contractual relations and therefore, cannot show a likelihood of success on this claim. Accordingly, the Court concludes that Gallagher is not entitled to injunctive relief on this claim.

### d.    Breach of Fiduciary Duty of Loyalty

Finally, Gallagher bases its request for injunctive relief on its claim that Reisinger breached his fiduciary duty of loyalty to Gallagher. In support of this claim, Gallagher contends that Reisinger was involved in activities leading to the misappropriation of Gallagher's confidential and proprietary customer information, including customer lists, client files, and records containing critical customer

29

information, which could be used by Reisinger and others to misappropriate Gallagher accounts. (Pl.'s Br. at 11.)   Gallagher argues that the mere naming of Reisinger and his new employer as broker of record for ALOM just one day after Reisinger's termination date is clear evidence of a breach of the fiduciary duty owed to Gallagher.  (*Id.*)  Gallagher's argument fails, however, to give due consideration to governing Pennsylvania law as well as to the record evidence.

Pennsylvania law holds generally that an employee owes a duty of loyalty to his or her employer, which requires the employee to "act with the utmost good faith and loyalty for the furtherance and advancement of the [employer's] interests." *Sylvester v. Beck,* 178 A.2d 755, 757 (Pa. 1962); *Kademenos v. Equitable Life Assurance Soc'y of U. S.,* 513 F.2d 1073, 1076 (3d Cir. 1975) (citing same; other citation omitted).  Thus, even in the absence of a restrictive covenant, an employee is obligated not to compete with his employer regarding the subject matter of his employment based on the duty of loyalty and fair dealing. *Kademenos,* 513 F.2d at 1076-77 (citing Restatement (Second) of Agency § 393 (1957)).  However, this obligation is not absolute, as noted by the Pennsylvania Supreme Court in *Spring Steels, Inc. v. Malloy,* 162 A.2d 370, 375 (Pa. 1960):

> "After the termination of his agency, in the absence of a restrictive agreement, the agent can properly compete with his principal as to matters for which he has been employed.  *See* sec. 396.  Even before the termination of the agency, he is entitled to make arrangements to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein.  Thus, before the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete . . ."

*Id.* (quoting Restatement (Second) of Agency § 393 cmt. e).  The Pennsylvania Supreme Court further opined:

> Nor is the fact that the new company may acquire some of the

30

> plaintiff's former customers contrary to law.  It is not a phenomenal thing in American business life to see an employee, after a long period of service, leave his employment and start a business of his own or in association with others.  And it is inevitable in such a situation, where the former employee has dealt with customers on a personal basis that some of those customers will want to continue to deal with him in his new association.  This is natural, logical and part of human fellowship, that an employer who fears this kind of future competition must protect himself by a preventive contract with his employee, unless, of course, there develops a confidential relationship which of itself speaks for non-disclosure and non-competition in the event the employer and employee separate.

*Id.*

Additionally, Pennsylvania courts, acknowledging the spirit of free competitive enterprise in America, have been reluctant to restrain an individual's inalienable right to determine his or her choice of employment in the absence of some quid pro quo. *Id.* at 374; *Renee Beauty Salons,* 652 A.2d at 1347 (citing *Spring Steels, supra*).  In *Spring Steels,* a formal employment contract and restrictive covenant did not exist.  Moreover, the court found no evidence of either a confidential relationship, fraud, deception, or any violation of any confidence acquired during the employee's employment.  *Id.*  Accordingly, the Pennsylvania Supreme Court affirmed the decision below denying injunctive relief against the former employee.  *Id.*

As in *Spring Steels,* the record in the instant action is devoid of any evidence showing that Reisinger engaged in any unlawful act that could form the basis for finding a breach of a duty of loyalty.  There is simply no evidence here that Reisinger, while employed by Gallagher, took any actions to divert business from Gallagher to his new employer, or disclosed confidential information belonging to Gallagher.  To the contrary, Reisinger testified that he returned all customer information, files and his computer to Gallagher prior to his departure from Gallagher, and Gallagher

31

has presented no evidence to suggest otherwise.  Moreover, the fact that Reisinger and his new employer were named as broker of record for ALOM only one day after his employment with Gallagher ceased does not mandate the conclusion that he breached a fiduciary duty owed to Gallagher, especially where the evidence of record shows that he did not solicit ALOM during his employment with Gallagher and in light of this Court's conclusion that the restrictive covenants are not enforceable and Gallagher failed to establish its claims of misappropriation of trade secrets, conversion and tortious interference with contract.  Therefore, the Court concludes that Gallagher has not shown a likelihood of success on the merits of its claim of breach of a fiduciary duty of loyalty.

### 2.      Irreparable Harm to Plaintiff

Even assuming, for argument's sake, that Gallagher was able to satisfy its burden of showing a likelihood of success on the merits of its claims, it cannot demonstrate irreparable harm resulting from Reisinger's conduct.   "A preliminary injunction cannot be granted absent a showing of irreparable harm."  *Viad Corp. v. Cordial,* 299 F.Supp. 2d 466, 480 (W.D.Pa. 2003) (citing *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir. 1989)) (other citation omitted).

In order to prove irreparable harm, the moving party "must 'demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial.'"  *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir.1994) (quoting *Instant Air Freight,* 882 F.2d at 801).  "Economic loss does not constitute irreparable harm." *Id.*  at 653.   "[T]he injury created by a failure to issue the requested injunction must ' "be of a peculiar nature, so that compensation in money cannot atone for it." ' " *Id.*  (citations omitted).  The word "irreparable connotes ' "that which cannot

be repaired, retrieved, put down again, atoned for." ' " *Id.* (citations omitted). In addition, the claimed injury cannot merely be possible, speculative or remote. "[M]ore than a risk of irreparable harm must be demonstrated.  The requisite for injunctive relief has been characterized as a 'clear showing of immediate irreparable injury,' or a 'presently existing actual threat; [an injunction] may not be used simply to eliminate a possibility of a remote future injury...'" *Id.* at 655 (citations omitted).  In the context of trademark infringement, the courts have held that a loss of control of reputation, loss of trade, or loss of good will can be grounds for irreparable injury. *Kos Pharm.,* 369 F.3d at 726 (citing *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 805 (3d Cir. 1998)).

Gallagher argues that it has suffered irreparable harm as a result of Reisinger's actions in the form of cancelled policies and other products, and loss of its customer goodwill.  Gallagher further submits that Reisinger's acts are ongoing and pose a significant threat to it, as Gallagher has already taken the ALOM account and has shown a willingness to solicit others.  According to Gallagher, it is impossible to calculate future profits and the goodwill that Reisinger's conduct will cost it. Therefore, Gallagher argues, because the possible consequences of Reisinger's acts are unascertainable and incapable of being fully compensated by money damages, the Court should issue an injunction to enforce its rights under Pennsylvania law and to prevent irreparable harm.  (Pl.'s Br. at 15-16.)

In response, Reisinger counters that the ALOM account generates easily quantifiable revenues which, if Gallagher ultimately prevails on the merits of its claims, can be collected as damages.  Reisinger maintains that such economic loss does not constitute irreparable harm, citing *Dice v. Clinicorp, Inc.,* 887 F.Supp. 803, 809 (W.D.Pa. 1995).  Reisinger further maintains that

33

although the Executive Agreement contains a provision that states that breach of the restrictive covenant will cause irreparable harm, this Court is not bound by this stipulation absent any other evidence in support of a showing of irreparable harm. *Id.* at 810.

Based on the evidence adduced at the hearing, the Court is not convinced that Gallagher will suffer irreparable harm if the preliminary injunction is not granted. So far, only one of Gallagher's customers, ALOM, shifted its business to Reisinger, and this loss appears to be quantifiable, as Mr. Bernstein testified that the loss of revenue from this account in 2007 is approximately $ 135,000 to $ 154,000. As noted by at least two district courts within the Third Circuit, where a loss of customers to a competitor could be quantified and compensated by money damages, irreparable harm was found lacking. *See, e.g., Mettler-Toledo, Inc. v. Acker,* 908 F.Supp. 240, 248 (M.D.Pa. 1995); *Viad Corp.*, 299 F.Supp. 2d at 481-82 (citing *Mettler-Toledo*). As to the possibility that other customers of Gallagher will shift their business to Reisinger, Gallagher offered no evidence of the actual or imminent loss of additional customers, such as proof that Reisinger was actively soliciting its other customers or actually obtained broker-dealer of record authorizations from other customers.[11] Without such evidence, the harm, if any to Gallagher, is simply too attenuated to justify the extraordinary relief of a preliminary injunction.

Accordingly, the Court finds that Gallagher has failed to make the required "clear showing of immediate irreparable harm" to warrant the imposition of injunctive relief.[12]

---

[11]Loss of one customer does not alone prove loss of goodwill.

[12]Moreover, because the Court has found that Gallagher has failed to carry its burden of proof regarding likelihood of success on the merits of its claims or irreparable harm, the Court need not address the balancing of the equities or the public interest elements. *Viad Corp.*, 299 F.Supp. 2d at 482 n. 5.

### D.    Conclusions of Law

Consistent with the above findings of fact and discussion, the Court makes the following conclusions of law:

1.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

2.   Venue lies in this district pursuant to 28 U.S.C. § 1391(a)(2).

3.   Federal Rule of Civil Procedure 65(a) authorizes district courts to order injunctive relief upon an appropriate showing.

4.  To obtain a preliminary injunction, the moving party must show: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos Pharm., Inc. v. Andrx Corp.,* 369 F.3d 700, 708 (3d Cir. 2004) (citing *Allegheny Energy, Inc. v. DQE, Inc.,* 171 F.3d 153, 158 (3d Cir. 1999)); *ACLU of New Jersey v. Black Horse Pike Reg. Bd. of Educ.*, 84 F.3d 1471, 1477 (3d Cir5. 1996).

5.   "Preliminary injunctive relief is 'an extraordinary remedy' and 'should be granted only in limited circumstances.'"  *Kos Pharm.,* 369 F.3d at 708 (quoting *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1427 (3d Cir. 1994)).

6.  Although Gallagher's request for injunctive relief is predicated upon state common law claims, federal law applies to determining whether injunctive relief is appropriate.  *Viad Corp. v. Cordial,* 299 F.Supp. 2d 466, 475 (W.D.Pa. 2003) (citing *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 799 (3d Cir. 1989)) (other citation omitted).

7.  Pennsylvania law governs the interpretation and enforcement of the Executive Agreement, *Echols v. Pellulo,* 377 F.3d 272, 275 (3d Cir. 2004) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313

U.S. 487, 497 (1941)); *Nationwide Mut. Ins. Co. v. West,* 807 A.2d 916, 920 (Pa. Super. 2002)

(citation omitted); *Verizon Commc'n Inc. v. Pizzirani,* 462 F.Supp. 2d 648, 655 (E.D.Pa. 2006)

(citing *Kruzits v. Okuma Mach. Tool, Inc.,* 40 F.3d 52, 55 (3d Cir. 1994)) (footnote omitted), as well

as Gallagher's state common law claims, *Covington v. Continental Tire, Inc.,* 381 F.3d 216, 218 (3d

Cir. 2004); *Highlands Ins. Co. v. Hobbs Group, LLC,* 373 F.3d 347, 351 (3d Cir. 2004) (citing *Erie

R.R. v. Tompkins,* 304 U.S. 64, 78 (1938)).

    8.   Under Pennsylvania law, restrictive covenants are disfavored and will only be enforced

if the employer shows that the covenants are (1) ancillary to an employment relationship between

the parties; (2) supported by adequate consideration; (3) reasonably necessary for the protection of

the employer; and (4) reasonably limited in duration and geographic extent. *Hess v. Gebhard & Co.,

Inc.,* 808 A.2d 912, 917 (Pa. 2002) (citations omitted); *George W. Kistler, Inc. v. O'Brien,* 347 A.2d

311, 314 (Pa. 1975) (citations omitted).

    9.   Reisinger, as the party challenging the validity of the Executive Agreement, bears the

burden of proving that the terms of the non-compete clause and other restrictions are not supported

by consideration and/or are unreasonable. *Fisher Bioservices, Inc. v. Bilcare, Inc.,* Civ. A. 06-567,

2006 WL 1517382, *10 (E.D.Pa. May 31, 2006) (citing *John G. Bryant Co. v. Sling Testing &

Repair, Inc.,* 369 A.2d 1164, 1169-70 (Pa. 1977)).

    10.   Where a restrictive covenant is not included in the initial contract of employment, a

restrictive covenant subsequently agreed to must be supported by new consideration in order to be

valid. *Kistler,* 347 A.2d at 316 (citing *Maintenance Specialties Inc. v. Gottus,* 314 A.2d 279, 281

(Pa. 1974); *Jacobson & Co. v. Int'l Env't Corp.,* 235 A.2d 612 (Pa. 1967)).

    11.   "'[W]hen the relationship of employer and employee is already established without a

restrictive covenant, any agreement thereafter not to compete must be in the nature of a new contract based upon a new consideration.'" *Kistler,* 347 A.2d at 316 (quoting *James C. Greene v. Kelley Co.,* 134 S.E.2d 166, 167 (N.C. 1964)).

12.   The mere continuation of the employment relationship at the time the agreement containing the restrictive covenants is executed does not constitute sufficient consideration for the covenants, even though the employment relationship is terminable at the will of either party.  *Id.* (citing *Maintenance Specialties, supra*) (footnote omitted).

13.   The restrictive covenants in the Executive Agreement were not included in the initial contract of employment and are not supported by any new consideration.

14.   Reisinger has met his burden of showing the restrictive covenants in the Executive Agreement are not supported by adequate consideration, and therefore, are not enforceable.

15.   Gallagher has failed to show that it has a likelihood of succeeding on the merits of its breach of contract claim.

16.   In the absence of an enforceable restrictive covenant governing non-disclosure, a former employee may still be held liable for disclosure of confidential and proprietary information if the employer can establish a claim for misappropriation of trade secrets.  *Spring Steels, Inc. v. Molloy,* 162 A.2d 370, 372 (Pa. 1960) (quoting *Morgan's Home Equip. Corp. v. Martucci,* 136 A.2d 838, 842 (Pa. 1957).

17.   Under Pennsylvania law, to state a viable claim for misappropriation of trade secrets, the plaintiff must show:  "'(1) that there was a trade secret; (2) that it was of value to [the] employer and important in the conduct of his business; (3) that by reason of discovery of ownership the employer had the right to the use and enjoyment of the secret; and (4) that the secret was

communicated to the employee while he was in a position of trust and confidence under such circumstances as to make it inequitable and unjust for him to disclose it to others, or to make use of it himself, to the prejudice of his employer." *Iron Age Corp. v . Dvorak,* 880 A.2d 657, 662-63 (Pa. Super. 2005) (citing *O.D. Anderson, Inc. v. Cricks*, 815 A.2d 1063, 1072 (Pa.Super.2003)).

18.  In determining whether the allegedly misappropriated information constitutes a trade secret, the Pennsylvania courts have considered the following factors:

> (1)    the extent to which the information is known outside the owner's business;
> (2)    the extent to which it is known by employees and others involved in the owner's business;
> (3)    the extent of measures taken by the owner to guard the secrecy of the information;
> (4)    the value of the information to the owner and to his competitors;
> (5)    the amount of effort or money expended by the owner in developing the information; and
> (6)    the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* at 663 (quoting *Christopher M's Hand Poured Fudge, Inc. v. Hennon,* 699 A.2d 1272, 1275 (Pa. Super. 1997)).

19.  To constitute a trade secret, the information must be an actual secret of the employer and not just comprise its "general trade practices." *Id.* at 664 (citing *Felmlee v. Lockett,* 351 A.2d  273 (Pa. 1976) (citation omitted)).

20.  The "information must be of peculiar importance to the employer's business" in order to be protected as a trade secret.  *Id.*

21.  The term "trade secret" does not, however, encompass an employee's aptitude, skill, dexterity, or his or her manual and mental ability.  *Id.* at 663 (citing *Christopher M's,* 699 A.2d at

1275).   Likewise, "'such other subjective knowledge'" that is acquired during the term of employment does not rise to the level of a protectable trade secret.  *Id.* (quoting *Christopher M's, supra*).

22.   When analyzing a claim for misappropriation of trade secrets, "such analysis must balance the right of a business person to be protected against 'unfair competition stemming from the usurpation of his or her trade secrets' against the right of an individual to 'the unhampered pursuit of the occupations and livelihoods for which he or she is best suited.'"  *Id.* (quoting *Renee Beauty Salons, Inc. v. Blose-Venable,* 652 A .2d 1345, 1347 (Pa. Super. 1995)).

23.   "'[T]he crucial indicia for determining whether certain information constitutes a trade secret are substantial secrecy and competitive value to the owner.'" *Id.* (quoting *O.D. Anderson,* 815 A.2d at 1070).

24.   While customer lists are generally considered trade secrets, merely delineating the information sought to be protected as "customer lists" does not automatically afford trade secret status to that information.  *Pestco, Inc. v. Associated Products, Inc.,* 880 A.2d 700, 706-07 (Pa. Super. 2005) (citations omitted).

25.   For each of the different types of information that it is claiming is confidential and/or proprietary, *i.e.,* customer lists, client files, and records containing critical customer information, Gallagher has failed to show that the particular information was an actual secret specific to its business and not otherwise available or accessible.

26.   Gallagher has not demonstrated that it has a protectable interest in its customer lists.

27. Although there is no evidence in this case that Reisinger compiled a new customer list utilizing Gallagher's customer information, "[p]ieces of information concerning customers which

39

an employee may recall from years of dealing with and helping to compile the same, or comparable data which he is able to compile on his own based on the experience and knowledge acquired through years of working in the business, are not protected as confidential trade secrets." *Mettler-Toledo, Inc.,* 908 F.Supp. 240, 248 (M.D.Pa. 1995).

28.   Reisinger is entitled to use all the skills, knowledge and business acumen he acquired during the course of his employment with Gallagher. *Id.*; *Iron Age Corp.,* 880 A.2d at 663.

29.   So long as Reisinger does not utilize any trade secrets or confidential information of Gallagher, he is free to compete aggressively against it. *Mettler-Toledo,* 908 F.Supp. At 248.   There is no evidence here suggesting that Reisinger utilized Gallagher's confidential information.

30.   Gallagher has failed to meet its burden of proving that the information it seeks to protect as  confidential and proprietary information constitutes a trade secret under Pennsylvania law.

31.   Of the specific types of confidential information to which benefits consultants are generally given access, the only information which could possibly constitute trade secrets are Gallagher's design of retirement plans, investments offered, compensation received, and formula for determining compensation.   Reisinger did not retain, in either physical or electronic form, any of this information when he left Gallagher.

32.   Gallagher has not shown a likelihood of success on the merits of its claim of misappropriation of trade secrets.

33.   Under Pennsylvania law, a claim for conversion is the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification. *McKeeman v. Corestates Bank, N.A.,* 751 A.2d 655, 659 n.3 (Pa.Super. 2000) (quoting *Stevenson v. Economy Bank of Ambridge,* 197 A.2d 721, 726 (Pa. 1964)) (other citation omitted).

34.   The evidence shows that Reisinger did not retain any physical property belonging to Gallagher when he left, nor did he disclose any confidential information after his departure.

35.   Gallagher has failed to establish an essential element of its claim of conversion.

36.   Gallagher has not shown a likelihood of success on its conversion claim.

37.   The Pennsylvania Supreme Court has explicitly adopted Section 766 of the Restatement (Second) of Torts with regard to claims of tortious interference with existing contracts. *Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 659 (3d Cir.1993) (citing *Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 393 A.2d 1175, 1183 (Pa.1978)).

38.   To state a viable claim for tortious interference with a contract under Pennsylvania law, the following four elements must be demonstrated:

>   (1)   the existence of a contractual, or prospective contractual relation between the complainant and a third party;
>   (2)   purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;
>   (3)   the absence of privilege or justification on the part of the defendant; and
>   (4)   the occasioning of actual legal damage as a result of the defendant's conduct.

*Remick v. Manfredy,* 238 F.3d 248, 263 (3d Cir. 2001) (citing *Pelagatti v. Cohen*, 536 A.2d 1337, 1343 (Pa. Super. 1987)).

39.   The evidence shows that as of the date of the hearing, Reisinger did not solicit ALOM or any other Gallagher customers.

40.   Gallagher has failed to show purposeful action on the part of Reisinger to interfere with Gallagher's contracts with its customers, and therefore, cannot establish its claim for tortious interference with contractual relations.

41

41.  Gallagher has failed to show a likelihood of success on the merits of its claim of tortious interference with contractual relations.

42.  Pennsylvania law holds generally that an employee owes a duty of loyalty to his or her employer, which requires the employee to "act with the utmost good faith and loyalty for the furtherance and advancement of the [employer's] interests." *Sylvester v. Beck,* 178 A.2d 755, 757 (Pa. 1962); *Kademenos v. Equitable Life Assurance Soc'y of U. S.,* 513 F.2d 1073, 1076 (3d Cir. 1975) (citing same; other citation omitted).

43.  Even in the absence of a restrictive covenant, an employee is obligated not to compete with his employer regarding the subject matter of his employment based on the duty of loyalty and fair dealing.  *Kademenos,* 513 F.2d at 1076-77 (citing Restatement (Second) of Agency § 393 (1957)).  However, this obligation is not absolute.  *Spring Steels, Inc. v. Malloy,* 162 A.2d 370, 375 (Pa. 1960).

44.  After the termination of his employment, in the absence of a restrictive agreement, an employee can properly compete with his employer as to matters for which he has been employed. Even prior to  the termination of his employment, an employee is entitled to make arrangements to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein.  *Spring Steels*, 162 A.2d at 375 (quoting Restatement (Second) of Agency § 393 cmt. e).

45.  Pennsylvania courts, acknowledging the spirit of free competitive enterprise in America, have been reluctant to restrain an individual's inalienable right to determine his or her choice of employment in the absence of some quid pro quo. *Id.* at 374; *Renee Beauty Salons,* 652 A.2d at 1347 (citing *Spring Steels, supra*).

42

46.  The record is devoid of any evidence showing that  Reisinger engaged in any unlawful act that could form the basis for finding a breach of a duty of loyalty.

47.  There is no evidence here that Reisinger, while employed by Gallagher, took any actions to divert business from Gallagher to his new employer or disclosed confidential information of Gallagher.

48.  Gallagher has failed to establish a claim for breach of fiduciary duty of loyalty.

49.  Gallagher has not shown a likelihood of success on the merits of its claim of breach of a fiduciary duty of loyalty.

50.  Even assuming, for argument's sake, that Gallagher was able to satisfy its burden of showing a likelihood of success on the merits of its claims, it cannot demonstrate irreparable harm resulting from Reisinger's conduct.

51.  "A preliminary injunction cannot be granted absent a showing of irreparable harm." *Viad Corp. v. Cordial,* 299 F.Supp. 2d 466, 480 (W.D.Pa. 2003) (citing *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir. 1989)) (other citation omitted).

52.  In order to prove irreparable harm, the moving party "must 'demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial.'" *Acierno v. New Castle County,* 40 F.3d 645, 653 (3d Cir.1994) (quoting *Instant Air Freight,* 882 F.2d at 801).

53.  "Economic loss does not constitute irreparable harm." *Id.*  at 653.

54.  In the context of trademark infringement, a loss of control of reputation, loss of trade, or loss of good will can be grounds for irreparable injury.  *Kos Pharm.,* 369 F.3d at 726 (citing *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 805 (3d Cir. 1998)).

55.  Although a contract may contain a provision to the effect that breach of the restrictive

43

covenant will cause irreparable harm, a court is not bound by this provision absent any other evidence in support of a showing of irreparable harm. *Dice v. Clinicorp, Inc.,* 887 F.Supp. 803, 810 (W.D. Pa. 1995).

56.  Based on the evidence adduced at the hearing, the Court is not convinced that Gallagher will suffer irreparable harm if the preliminary injunction is not granted.

57.  Where a loss of customers to a competitor could be quantified and compensated by money damages, irreparable harm was found lacking. *See, e.g., Mettler-Toledo, Inc. v. Acker,* 908 F.Supp. 240, 248 (M.D.Pa. 1995); *Viad Corp.*, 299 F.Supp. 2d at 481-82 (citing *Mettler-Toledo*).

58.  Thus far, only one of Gallager's customers, ALOM, has shifted its account to Reisinger, and this loss appears to be quantifiable and compensable by money damages.

59.  Loss of one customer does not alone constitute loss of good will.

60.  As to the possibility that other customers of Gallagher will shift their business to Reisinger, Gallagher offered no evidence of the actual or imminent loss of additional customers, such as proof that Reisinger was actively soliciting its other customers or actually obtained broker-dealer of record authorizations from other customers.

61.  Without such evidence, the harm, if any to Gallagher, is simply too attenuated to justify the extraordinary relief of a preliminary injunction.

62.  Gallagher has failed to make the required "clear showing of immediate irreparable harm" to warrant the imposition of injunctive relief.

63.  Because the Court has found that Gallagher has failed to carry its burden of proof regarding likelihood of success on the merits of its claims or irreparable harm, the Court need not address the balancing of the equities or the public interest elements. *Viad Corp.*, 299 F.Supp. 2d at

44

482 n. 5.

64.  Gallagher has failed to establish that it is entitled to a preliminary injunction.


**III.**   **CONCLUSION**

For the reasons set forth above, it is respectfully recommended that Plaintiff's Motion for Preliminary Injunction (Doc. 5) be denied.  It is further recommended that a ruling on Plaintiff's Motion for Permanent Injunction be postponed until the underlying merits of Plaintiff's claims have been determined either on summary judgment motion or upon verdict after a jury trial.

In accordance with the Magistrate Judges Act, 28 U.S.C.  § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates Judges, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation.  Any party opposing the objections shall have ten (10) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.


Dated:  June 11, 2007                          By the Court:



    s/Lisa Pupo Lenihan
LISA PUPO LENIHAN
United States Magistrate Judge


cc:      Honorable Donetta W. Ambrose
      Chief United States District Judge

      All Counsel of Record
      Via Electronic Mail